IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MBSC Property South, LLC | ) | Civil Action No. 4:25-cv-1475-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **DEFENDANT CITY OF MYRTLE** |
| | ) | **BEACH'S MOTION TO DISMISS AND** |
| The City of Myrtle Beach, South | ) | **MEMORANDUM IN SUPPORT** |
| Carolina, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

For the reasons below, Defendant City of Myrtle Beach moves to dismiss Plaintiff MBSC

Property South, LLC's complaint (Dkt. No. 1-1) with prejudice under Rule 12(b)(6) of the Federal

Rules of Civil Procedure.

## INTRODUCTION

The issue in the case is narrow: can Myrtle Beach prohibit a use of property across a strip

of land which, if allowed to continue, will result in reduced police and fire services, loss of jobs

and income for residents, and harm to Myrtle Beach's economic engine that benefits all who live

in and visit the city? The answer is self-evident—of course it can. Undeterred, however, MBSC

spins an 11-count declaratory judgment and an assortment of constitutional and statutory claims

to deprive the City of this right all for MBSC's own financial benefit. But contrary to conventional

wisdom, throwing enough at the wall does not mean something will stick. Controlling case law

defeats each of MBSC's claims. This Court therefore should dismiss the complaint in its entirety

with prejudice.

## FACTUAL/PROCEDURAL BACKGROUND

The core of this case arises from a zoning "Overlay Zone" within the City which prohibits new conversions of multi-family dwellings between South Kings Highway and the Atlantic Ocean from short term to long term rentals. Dkt. No. 1-1 at 7–8, ¶28. As defined, the overlay covers the City's entire coastal edge:



The overlay began as a temporary moratorium on these long term rental conversions

> in order for the City, through its officials, staff, boards and/or committees, to have adequate time and opportunity to study and analyze the loss of short term rental inventory and the impacts and consequences resulting therefrom and to make recommendations to City Council concerning changes to the City's Zoning Code and other ordinances and regulations relating to zoning and land use planning.

Exhibit A, Mrytle Beach Ordinance No. 2024-27, at 2.[1] The City gave the moratorium ordinance first reading on April 9, 2024, and second reading on May 14, 2024. *Id.*; *see also* Dkt. No. 1-1 at 6–7, ¶22. The moratorium would be in effect for about nine months, until early 2025, and did not impact buildings which had already received permits to create long term rentals before the ordinance's first reading. *Id.*

---

[1] The complaint references but does not attach several key documents. The City attaches them here for the Court's review. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (holding a court may consider a document included with a motion to dismiss "that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity"). Furthermore, many of the documents are public records which the Court can take judicial notice of on a motion to dismiss. *Zak v. Chelsea Therapeutics Intern., Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

While the moratorium was in place, the City commissioned an independent third-party consulting firm, Arnett Muldrow & Associates, to research the impact of converting multi-family short-term rentals along the coast to long term rentals. Dkt. No. 1-1 at 7, ¶25. Arnett Muldrow concluded that the City would lose $2.48 million for every 1,000 rooms converted from short term rentals to long term rentals, with state-wide losses ballooning to $7.51 million for every 1,000 rooms. Exhibit B, Housing Conversion Study City of Mrytle Beach, at 4; *see also* Dkt. No. 1-1 at 7, ¶26 (alleging that Arnett Muldrow created a PowerPoint presentation which was given to City Council). But Arnett Muldrow did not stop at just the direct economic losses these conversions would cause governments to suffer. It concluded that conversions would eliminate jobs and cause compensation for area residents to drop. *Id*. at 5. And police responses to calls for service at long term rentals cost 93% more compared to short term rentals, while fire response times are 28.7% longer. *Id*. at 8.

The Myrtle Beach Planning Commission also reviewed the proposed overlay during this study period. It found that the overlay "is consistent with the Land Use and Economic Development Elements of the Comprehensive Plan," observed that "[t]his area was always intended to be primarily used for short-term rentals, which are essential for our local economy," and recommended the overlay's approval. Exhibit C, First Reading, Myrtle Beach Ordinance No. 2024-69, at 1. *But see* Dkt. No. 1-1 at 9, ¶33(a)(ii) (alleging that the overlay "conflicts with the City's Comprehensive Plan"). The Economic Development Element of the comprehensive plan highlights the importance of overnight tourism to the City and, in particular, to those who live and work in the City. Exhibit D, City of Myrtle Beach Comprehensive Plan – 2024, at 23. Tourism has a snowball effect—more tourism means more money spent locally, which means more local jobs and cultural benefits, which means more investment in infrastructure and development. *Id.*

"Ultimately, the sustained growth of tourism will lead to higher standards of living for residents and a more vibrant, prosperous community." *Id.* To that end, the Land Use Element urges the City to "[p]rovide business and employment opportunities, balancing the importance of tourism and the need to accommodate the expansion of business and employment opportunities in other sectors," which includes supporting efforts "to accommodate an expanded year-round tourism industry that taps new markets." *Id.* at 132.

From this, City Council concluded that a "Short-Term Rental Conversion Overlay Zone" was needed to "sustain the economic vitality of the Myrtle Beach oceanfront by preserving and enhancing tourist accommodations between Kings Highway at the Atlantic Ocean." Dkt. No. 1-1 at 7–8, ¶28. The overlay zone ordinance provides that no building or structure within that zone "consisting of more than two (2) units, including each unit within such building or structure, that was constructed or used as Visitor Accommodation, commonly known as short term rental, may be used for rental or lease for ninety (90) continuous days or more." *Id.* Exempted from the ordinance are "[o]wners of units within the overlay zone that are legally operating with a business license for long term rental at the time of adoption . . . so long as the owner maintains the business license for long term rental." Exhibit E, Myrtle Beach Ordinance 2024-69, at 1. City Council gave the overlay ordinance first reading on December 3, 2024, and second reading on December 10, 2024. Dkt. No. 1-1 at 7, ¶27. The overlay therefore took effect before the expiration of the moratorium.

MBSC owns 169 out of 240 condominium units in the Sand Castle South building located within the moratorium and overlay zone which it wants to covert to long term rentals.[2] Dkt No. 1-

---

[2] MBSC alleges that "many" of the building's units "are currently operating as primary residences – either by the owner or rented long-term." Dkt No. 1-1 at 5, ¶13. But MBSC does not

1 at 4–6, ¶¶8, 14, 18–19. But through no fault of the City and for reasons unrelated to the future moratorium, MBSC's properties are not up to code for that conversion. *Id.* at 6, ¶¶16–17. As a result, on March 12, 2024, the City rejected MBSC's long term rental business license application. *Id.* at 6, ¶16; *see also* Exhibit F, Myrtle Beach Business License Division Letter. The letter cautioned that "[y]ou are not to engage in this business until you have complied with the requirements of the City Code of Ordinances" and gave MBSC 15 days—until March 27, 2024—to resolve the defects. Ex. F. MBSC did not cure the defects within the allotted timeframe. *See* Dkt. No. 1-1 at 6–7, ¶¶22–23 (noting that the defects had not been cured before the moratorium, which was given first reading on April 9, 2024, and took effect on May 14, 2024). Neither did MBSC object to the rejection of its application, claim it was in fact in compliance with the City's codes, or seek an extension of time to comply. As a result of MBSC's inaction, the City's rejection of its application became final on March 27, 2024. MBSC did not submit a new business license application until August 27, 2024, after the moratorium had been in effect for months. *Id.* at 7, ¶24.

So MBSC did not have a license to operate its properties as long term rentals when City Council gave first or second reading to the moratorium. MBSC's self-imposed inability to secure a business license—and thereby convert the property to long term rentals—is now the basis for this action. Dkt. No. 1-1 at 8, ¶29–30. It sued the City in state court seeking a declaratory judgment and bringing claims for violation of substantive due process, violation of equal protection, a regulatory taking, and violations of two provisions of the Fair Housing Act of 1968, 42 U.S.C. §§ 3604 and 3617. The City timely removed the case to this Court. Dkt. No. 1. For the reasons below, this Court should dismiss MBSC's claims in their entirety.

---

state whether any of *its* units currently are rented long term. It simply alleges that it "submitted a business license application to establish long-term rentals at the Properties." *Id.* at 5, ¶15. It therefore appears that MBSC did not have a license to operate any of its units as long term rentals.

## STANDARD FOR DISMISSAL

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard requires that a plaintiff allege sufficient facts 'to raise a reasonable expectation that discovery will reveal evidence' that supports the plaintiff's claim." *Id.* (quoting *Twombly*, 550 U.S. at 556). While a court must accept all "well-pleaded facts" as true, that requirement does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678- 79. Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Twombly*, 550 U.S. at 556. The plausibility standard also requires a complaint to provide "fair notice" to the defendant of the basis for the claims. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

## LAW/ANALYSIS

I.      **MBSC Fails to Allege Facts Sufficient to Support a Declaratory Judgment that the Overlay Violates State Law.**

The overlay ordinance is presumed valid. *See Rush v. City of Greenville*, 143 S.E.2d 527, 531 (S.C. 1965) ("There is a strong presumption in favor of the validity of municipal zoning ordinances, and in favor of the validity of their application"); *see also Rushing v. City of Greenville*, 217 S.E.2d 797, 799 (S.C. 1975) ("The Court will not overturn the action of the City if the decision is fairly debatable because the City's action is presumed to have been a valid exercise of power and it is not the prerogative of the Court to pass upon the wisdom of the decision."). Here, MBSC

cannot overcome this presumption. In fact, MBSC's allegations and the documents which it relies on prove the ordinance's validity. Its claims therefore fail as a matter of law.

**A.     The overlay does not violate the South Carolina Local Government Comprehensive Planning Enabling Act of 1994.**

MBSC seeks a declaration that the overlay violates the South Carolina Local Government Comprehensive Planning Enabling Act of 1994 in five ways. But it is wrong on every count.

*The overlay does not violate S.C. Code Ann. § 6-29-710.*

MBSC claims that the City's stated purpose for overlay is not an authorized purpose for zoning ordinances under S.C. Code Ann. § 6-29-710. Dkt. No. 1-1 at 9, ¶33(1)(i). But MBSC's own allegations show that the overlay satisfies the statute. First, § 6-29-710(A)(7) explicitly authorizes "safety from fire, flood, and other dangers" as a stated purpose for zoning ordinances. To that end, MBSC alleges that City Council was presented a comprehensive recommendation in the Arnett Muldrow study which detailed the positive fire and police support, financial and general welfare impacts the overlay will have. Ex. B at 5, 8; Dkt. No. 1-1 at 7, ¶26. Second, § 6-29-710(A)(3) authorizes a zoning ordinance "to facilitate the creation of a convenient, attractive, and harmonious community." Falling squarely within that language, the complaint alleges one of City's purposes behind the overlay was to "preserv[e] and enhanc[e] tourist accommodations between Kings Highway and the Atlantic Ocean." Dkt. No. 1-1 at 9, ¶33(a)(i). The overlay also is consistent with the comprehensive plan element finding that increased tourism "will lead to higher standards of living for residents and a more vibrant, prosperous community." Ex C at 1; Ex. D at 23. And third, § 6-29-710(A)(8) provides a catchall for any purpose which "further[s] the public welfare in any other regard specified by a local governing body." At first reading for the overlay, City Council specifically addressed how the overlay will prevent matters of great concern to the public such as lost job opportunities and income, decreased public safety, and lost revenue. Ex. C at 1. These

harms caused by the loss of short term rentals "pose a risk of public harm inasmuch as the lost revenue will effect the level of municipal services and amenities and cause a general deterioration in the quality of life and standard of living enjoyed by citizens." Ex. A at 1–2; *see also id.* ("[T]he loss of tourism-related revenue will negatively effect the City's ability to provide current levels of public services and amenities which, in turn, will compromise public health, safety and welfare[.]"). Additionally, courts may look beyond the City's stated purpose to determine whether there was a legitimate purpose for a zoning regulation. *See Bibco Corp. v. City of Sumter*, 504 S.E.2d 112, 116 (S.C. 1998) ("In determining whether there is a legitimate government purpose, the actual motivations of the enacting governmental body are entirely irrelevant. A reviewing court need only decide what goals the government body could have been pursuing."). This means MBSC's myopic focus on one section of the overlay which discusses economic impacts misses the point. *See* Dkt. No. 1-1 at 8, ¶¶33(a)(i). The complaint and documents referenced in it provide several legitimate purposes for the overlay, and MBSC alleges no contrary facts.

In sum, MSBC does not just fail to plausibly allege the City's purpose falls outside any of these enumerated statutory purposes for a zoning ordinance. It alleges facts which prove that the overlay meets § 6-29-710. MBSC's requested declarations therefore should be dismissed.

*The overlay does not violate S.C. Code Ann. § 6-29-720(B).*

MBSC alleges that the overlay violates § 6-29-720(B) for two reasons: (1) it conflicts with the City's comprehensive plan, and (2) there is no rational basis to treat long term rentals differently than other uses of multi-family dwellings. Dkt. No. 1-1 at 9–10, ¶33(a)(ii)–(iii). MBSC is wrong on both counts.

*First,* all zoning regulations must "be made in accordance with the comprehensive plan for the jurisdiction, and be made with a view to promoting the purposes set forth throughout th[e]

chapter." S.C. Code Ann. § 6-29-720(B). MBSC does not cite any portion of the comprehensive plan, attach the comprehensive plan for this Court's review, or explain how reserving a strip of oceanfront properties for short term rentals conflicts with the broader goal of "promoting affordable housing." Dkt. No. 1-1 at 9, ¶33(a)(ii). MBSC's failure to cite the comprehensive plan is unsurprising, as a review of the plan puts MBSC's claim to rest.

Like any comprehensive plan, the City's plan balances several competing interests. As explained above, a matter of chief concern to the City is securing and growing tourism. *E.g.*, Ex. D at 23. Doing so provides innumerable benefits to the City, its residents, its visitors, and the whole community. *Id.* Of course, the City wants to provide affordable housing as well. *E.g.*, *id.* at 100; *id.* at 107 ; *id.* at 111; *id.* at 128. The plan also discusses several other elements, including natural resources, public services, population, cultural resources, natural disaster resilience, priority investment, and transportation. *Id.* at 3–6. So to succeed here, it is not enough for MBSC to allege that the overlay (purportedly) is inconsistent with one element of a city's comprehensive plan. If that were true, the development of any open lot would be barred by any policy in favor of greenspace. Instead, MBSC must show that the overlay is so out of sync with the comprehensive plan that it is arbitrary and unreasonable, and its validity not even "fairly debatable." *Knowles v. City of Aiken*, 407 S.E.2d 639, 642 (S.C. 1991). MBSC alleges no facts to make this showing. It simply isolates (without citing or identifying) discussions of affordable housing with no elaboration or context given the rest of the plan. This is insufficient as a matter of law to state a claim under § 6-29-720(B).

*Second*, MBSC's claim that the City violated § 6-29-720(B)'s uniformity requirement because there is no rational basis to "distinguish long-term rentals from other types of residential uses" is entirely unsupported. Dkt. No. 1-1 at 9–10, ¶33(a)(iii). "Except as provided in this chapter,

all of these regulations must be uniform for each class or kind of building, structure, or use throughout each district, but the regulations in one district may differ from those in other districts." S.C. Code Ann. § 6-29-720(B). In this context, "use" means "the purpose or activity for which land or buildings are designed, arranged, or intended, *or for which land or buildings are occupied or maintained.*" *Heilker v. Zoning Bd. of Appeals for City of Beaufort*, 552 S.E.2d 42, 45 (Ct. App. 2001) (emphasis added); *see also id.*, 552 S.E.2d at 46 (recognizing the term "use" as "amorphous" and includes "the types of activities, practices, and operations conducted in connection with the property's purpose"). Here, the operative buildings are multi-family dwellings and the operative use is short term rentals. The ordinance is uniform across these classes: none of those buildings may convert to a long term rental. MBSC's attempt to refocus the inquiry on the underlying zoning ordinance, which generally allows for use as a permanent residence without distinguishing between owner-occupied residences, short term rentals, and long term rentals, is unavailing. Dkt. No. 1-1 at 9–10, ¶33(a)(iii). Overlays, by definition, impose different requirements than the underlying zoning district. S.C. Code Ann. § 6-29-720(C)(5). As the more specific enactment, the overlay controls. Because it is internally uniform, MBSC's claim fails.

Even so, the City has a rational basis to distinguish between long term leases and short term rentals. "A party challenging a legislative enactment under rational basis review must negate every conceivable basis which might support the enactment and, therefore, has a steep hill to climb." *Ani Creation, Inc. v. City of Myrtle Beach Bd. of Zoning Appeals*, 890 S.E.2d 748, 758 (S.C. 2023) (cleaned up); *see also Lee v. S.C. Dep't of Nat. Res.*, 530 S.E.2d 112, 114 (S.C. 2000) (applying rational basis review and noting that "[a] legislative enactment will be sustained against constitutional attack if there is any reasonable hypothesis to support it") (cleaned up). The "invalidity" in a zoning ordinance must "appear[] so clearly as to leave no room for reasonable

doubt that it violates some provision of the Constitution." *City of Rock Hill v. Harris*, 705 S.E.2d 53, 55 (S.C. 2011). But rather than negate every conceivable basis for the City's actions, MBSC's complaint actually identifies many rational bases *for* the City's actions, including those set forth in the Arnett Muldrow study and in the ordinance itself. Ex. B; Dkt. No. 1-1 at 7, ¶25–26. MBSC therefore cannot state a claim that the overlay violates § 6-29-720(B).

*The overlay does not violate S.C. Code Ann. § 6-29-720(C)(5).*

MBSC's claim that the overlay violates § 6-29-720(C)(5) is equally unsupported by any facts. Dkt. No. 1-1 at 9, ¶33(a)(iv). This statute allows overlay zones "when there is a special public interest in a particular geographic area." The complaint baldly alleges there is no "special public interest" in the geographical area of the overlay without pleading any accompanying facts. *Id.* At any rate, there is special public interest in supporting tourism, improving public services, and improving the welfare of the City as a whole, and the overlay zone's ocean-front location is uniquely situated to do so. *See Lurey v. City of Laurens*, 217 S.E.2d 226, 227 (S.C. 1975) (stating there is a "strong presumption that the [city's] legislative power was exercised lawfully and in the public interest").

*The overlay does not violate S.C. Code Ann. § 6-29-760(A).*

MBSC also seeks a declaration that the overlay failed "one or more of the public notice and hearing requirements under S.C. Code Ann. § 6-29-760(A)." Dkt. No. 1-1 at 9, ¶33(a)(v). But it fails to allege a single fact relating to such failures. Without any supporting allegations, the claim necessarily fails.

\*      \*      \*

MBSC cannot make something out of nothing. And because there is nothing, MBSC cannot allege facts showing that the overlay violates the South Carolina Local Government

Comprehensive Planning Enabling Act of 1994. All MBSC does is allege facts which show how the City complied with the statute. The Court therefore should dismiss these requested declarations.

**B.    The overlay is not arbitrary, unreasonable, or an abuse of discretion, and it has a reasonable relation to a lawful purpose.**

MBSC generally seeks a declaration that the overlay "is arbitrary, unreasonable, an abuse of discretion, and has no reasonable relation to a lawful purpose." Dkt. No. 1-1 at 10, ¶33(b). Here too, MBSC does not back these contentions with any substantive facts. And for the reasons set forth above (at 3–4, 7–11) demonstrating all the lawful and laudable purposes behind the ordinance, MBSC cannot allege any facts to support these claims. MBSC's requested declaration here therefore fails as a matter of law as well.

**C.    The overlay is not unlawful spot zoning or reverse spot zoning.**

In a familiar fashion, MBSC baldly declares that the overlay "constitutes unlawful spot zoning or unlawful reverse spot zoning" without alleging a single supporting fact. Dkt. No. 1-1 at 10, ¶33(c). That is because there are no supporting facts to allege—the overlay is not spot zoning of any kind.

"Traditional spot zoning occurs when a small parcel of land is singled out for a use classification different from that of the surrounding area, for the benefit of the parcel's owner(s) and to the detriment of others." *Ani Creation*, 890 S.E.2d at 756. Unlike the overlay zone at issue, traditional spot zoning affects only a small tract of land or single owner. *Talbot v. Myrtle Beach Bd. of Adjustment*, 72 S.E.2d 66, 70 (S.C. 1952); *see also* 213 Am. Jur. Proof of Facts 3d 1 ("[I]mproperly discriminatory spot zoning usually involves a small parcel of land or a single parcel or limited area; the larger the parcel, the more difficult it is to sustain an allegation of spot zoning.") (cleaned up); *Ani Creation*, 890 S.E.2d at 757 (finding an overlay zone impacting an area of less

than 0.5 square miles did not constitute traditional spot zoning). Reverse spot zoning occurs when the surrounding area of small tract of land is subject to a uniform restriction, excluding an "island" of unrestricted land. *Ani Creation*, 890 S.E.2d at 757.

Here, the overlay runs the entire length of the City's coast. It is not the "small parcel" which spot zoning requires. And because the overlay zone includes MBSC's property, there have been no "changes to the zoning map around the parcel at issue" necessary to constitute reverse spot zoning. *Ani Creation*, 890 S.E.2d at 757. Additionally, even where spot zoning—in either form— is found to have occurred, it is only invalid where the ordinance being challenged "does not form a part of a comprehensive plan of zoning or is for mere private gain." *Talbot*, 72 S.E.2d at 7. There is no allegation that the overlay was implemented "for mere private gain," and the City discusses above (at 8–11) how MBSC cannot allege facts showing that it is not part of a comprehensive plan. Like the others, this claim fails too.

### D.     The overlay is not an unauthorized tax.

MBSC does not allege any facts supporting its specious claim that the overlay is, in reality, an exercise of unauthorized taxing power by the City rather than a zoning ordinance because it "does not regulate the use" of land. Dkt. No. 1-1 at 10, ¶33(d). As discussed above (at 9–10), it does regulate use. Further, MBSC's reliance on *Burns v. Greenville*, 861 S.E.2d 31 (S.C. 2021), to prove its point is misplaced. Dkt. No. 1-1 at 10, ¶33(d). In *Burns*, the court held a county "may not impose a new tax . . . unless specifically authorized by the General Assembly" in response to Greenville County enacting a heightened annual fee to all car owners to maintain road upkeep. 861 S.E.2d at 32 (citing S.C. Code Ann. § 6-1-310). The court found those annual, required "uniform service charges" to be an impermissible tax. *Id.* In contrast, the overlay does not alter or impose any taxes or fees. The fact that it regulates uses which have an *effect* on tax revenue raised under

existing laws and ordinances—as many zoning regulations will—does not make the overlay itself a tax. For example, changing a parcel's zoning designation from residential to commercial does not cease to be a zoning decision because the owner can now impose a sales tax. But it would under MBSC's view. Accepting this position would wreak havoc on local governments' zoning power. This Court should reject it out of hand.

**E.     The overlay does not regulate MBSC's right to contract.**

Next, MBSC seeks a declaration that the overlay "purports to regulate MBSC's right to contract" because it concerns ownership, not use. Dkt. No. 1-1 at 10, ¶33(e). This argument is largely a repeat of its earlier claims that the overlay does not regulate uses and violates § 6-29-720(B)'s uniformity requirement. *Id.* Just as before, this argument fails. Also, the overly does not improperly "regulate how property is owned or conveyed," as MBSC claims. *See id.* Nothing in the overlay mentions or affects ownership or conveyance; it simply regulates how long a third-party can rent. And ordinances regulating short term and long term rentals are common throughout the region, the coast, the state, and the country. Furthermore, MBSC cannot show how the out-of-state cases it cites, *City of Wilmington v. Hill*, 657 S.E.2d 670 (N.C. Ct. App. 2008), and *Graham Ct. Assocs. v. Town Council of Town of Chapel Hill*, 281 S.E.2d 418 (N.C. Ct. App. 1981), are relevant here or even consistent with South Carolina law. This argument therefore fails as well.

**F.     MBSC cannot rely on the "time of application" rule and has no vested rights in the property as long term rentals.**

MBSC wrongfully submits that it can avoid the overlay under the "time of application rule" because it "applied for a long-term rental business license before first reading of the Moratorium." Dkt. No. 1-1 at 11, ¶33(f)(i); *see also Pure Oil Div. v. City of Columbia*, 173 S.E.2d 140, 143 (S.C. 1970) (protecting the "good faith reliance by the owner on the right to use his property as permitted under the Zoning Ordinance in force at the time of the application for a permit"). The City rejected

MBSC's first application for a long term rental business license for reasons unrelated to the moratorium on March 12, 2024. Ex. F; Dkt. No. 1-1 at 6, ¶16. In that disapproval, the City granted MBSC a 15-day period to cure. Ex. F. But MBSC never cured those defects, never objected to the City's rejection, and never sought to extend its compliance period. Dkt. No. 1-1 at 6, ¶16. As a result, MBSC did *not* have a pending permit application when the moratorium received first reading on April 9, 2024. And it did not file a new application until August 27, 2024, after the moratorium had been in effect for over three months. Dkt. No. 1-1 at 7, ¶24. MBSC therefore has not adequately pled relief from the overlay under the "time of application rule."

MBSC also has no vested rights in the use of its property as long term rentals. MBSC alleges it had rights vested in this use because it made "significant investment in the acquisition of the Properties [] for [a] specific purpose" before the moratorium and overlay went into effect. Dkt. No. 1-1 at 11, ¶33(f)(ii). But a landowner can obtain a vested right only when the use is *validly permitted* and *already in existence*. *Boehm v. Town of Sullivan's Island Bd. of Zoning Appeals*, 813 S.E.2d 874, 883 (S.C. Ct. App. 2018); *Vulcan Materials Co. v. Greenville Cnty. Bd. of Zoning Appeals*, 536 S.E.2d 892, 900 n.13 (S.C. Ct. App. 2000); *Friarsgate, Inc. v. Town of Irmo*, 349 S.E.2d 891, 893 (S.C. Ct. App. 1986). A *contemplated* use of property, on the other hand, is not protected as a vested right. *Friarsgate*, 349 S.E.2d at 893; *see also Daniels v. City of Goose Creek*, 431 S.E.2d 256, 258 (S.C. Ct. App. 1993) (holding that a developer had no vested rights in an undeveloped project which was later frustrated by new zoning regulations.); *see also Whitfield v. Seabrook*, 190 S.E.2d 743, 746 (S.C. 1972) (rejecting a landowner's claim of a vested right to construct a proposed apartment complex, finding that expenditures for plans and specifications incurred before the issuance of the building permit could not have been made in reliance on the subsequently issued permit). Further, an expectation of future continuity in a zoning scheme is

unreasonable. *Daniels*, 431 S.E.2d at 258. Because MBSC was out of compliance with the City's code to convert the property to long term rentals before the moratorium, it did not have a business license or a pending application for that use when the moratorium went into effect, and it was barred from converting the property to long term rentals at the time, it cannot claim a vested right to operate long term rentals.

## II.     MBSC's Substantive Due Process Claim Fails Because It Has No Protected Property Interest and the City Did Not Take Irrational or Arbitrary Action.

To establish a violation of substantive due process, MBSC must demonstrate (1) that it had property or a property interest; (2) that the City deprived it of this property or property interest; and (3) that the City's action falls so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency. *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 827 (4th Cir. 1995). The claim exists only to prevent the government "from abusing its power or employing it as an instrument of oppression." *Sylvia Dev. Corp.*, 48 F.3d at 828 (cleaned up). So to succeed on a substantive due process claim, a plaintiff must show that the government's action was

> so arbitrary or irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies. Irrationality and arbitrariness imply a most stringent standard against which state action is to be measured in assessing a substantive due process claim.

*Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1995). The mere violation of state zoning laws, for example, is insufficient. *Sunrise Corp. of Mrytle Beach v. City of Myrtle Beach*, 420 F.3d 322, 327 (4th Cir. 2005); *see also Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 441 (4th Cir. 2002) ("More importantly, whether the County violated state law in regulating land use is not determinative of whether TCP's substantive due process rights were violated."). Here, even

assuming local laws were violated, which is denied, MBSC fails to allege sufficient facts to support a substantive due process violation.

*First*, MBSC has no property interest protected by the due process clause. The only right which it asserts is "an entitlement to the issuance of permits and business licenses to operate long-term rentals at the Properties." Dkt. No. 1-1 at 14, ¶52. But the mere desire or expectation of a permit or license does not equal a property interest in it. *Tri Cnty. Paving*, 281 F.3d at 436. In cases like this one, a property interest arises only when an applicant has satisfied all requirements for a permit and its issuance is a certainty. *Compare Sylvia Dev. Corp.*, 48 F.3d at 827 (holding that the plaintiff failed to establish a property right when it was not entitled to a particular zoning designation), *with Scott v. Greenville Cnty.*, 716 F.2d 1409, 1418 (4th Cir. 1983) (finding a plaintiff had a property right in a permit he was "entitle[d]" to upon presentment of the application). Here, it is undisputed that MBSC was *not* entitled to a license to convert the property to long term rentals when the moratorium went into effect. Ex. F; Dkt. No. 1-1 at 6, ¶16. It makes no difference that long term rental conversions generally were permitted at the time. *See* Dkt. No. 1-1 at 14, ¶52. MBSC must show that *it* met all requirements for that license when the moratorium went into effect. MBSC's allegations, however, confirm that it did not meet the requirements and that MBSC was, for reasons unrelated to the moratorium, legally prohibited from converting its property to long term rentals. Dkt. No. 1-1 at 5–7, ¶¶15–16, 23; Ex. F. MBSC therefore had no property interest protected by the due process clause.

Further, MBSC fails to show that the City's actions fall so far beyond the outer limits of legitimate governmental authority that no process could cure the deficiency. "[T]he Supreme Court has narrowed the scope of substantive due process protection in the zoning context so that such a claim can survive only if the alleged purpose behind the state action has no conceivable rational

relationship to the exercise of the state's traditional police power through zoning." *Sylvia Dev. Corp.*, 48 F.3d at 828 (cleaned up). City Council relied on the recommendation of third-party experts citing the negative financial, general welfare, and safety impacts long term rental conversions may have on the City. *See generally* Ex. B; Dkt. No. 1-1 at 7, ¶26. City Council also relied on the recommendation of the Planning Commission which found that the overlay is consistent with multiple elements of the City's comprehensive plan and that the overlay area "was always intended to be used for short-term rentals." Ex. C at 1. MBSC does not allege otherwise. So MBSC has not alleged any facts sufficient to show the City's actions were irrational or arbitrary. *See Tri Cnty. Paving*, 281 F.3d at 441 (holding that a county's decision to deny a building permit, and issue a one-year moratorium on such buildings for the betterment of general welfare was "far from arbitrary" because it was "grounded in rational health and safety concerns").

The Court therefore should dismiss MBSC's substantive due process claim.

## III. MBSC Fails to Show Disparate Impact, Discriminatory Intent, or an Arbitrary Legislative Purpose Sufficient to Maintain Its Equal Protection Claims.

To prove that a statute has been administered or enforced discriminatorily, more must be shown than a benefit denied to one person while conferred on another. *Snowden v. Hughes*, 321 U.S. 1, 8 (1944). Because the ordinance being challenged here is facially neutral, MBSC bears the burden of showing both a disparate impact and implicit discriminatory intent. *Sylvia Dev. Corp.*, 48 F.3d at 819. And if MBSC makes that showing, it must also show that the ordinance bears no rational relation to a legitimate government purpose. *Id.* at 820. Here as well, any perceived violation of state zoning laws, which is denied, is not a denial of equal protection. *Sunrise Corp.*, 420 F.3d at 327. The City's action must be arbitrary in the constitutional sense. *Sylvia Dev. Corp.*, 48 F.3d at 825. As explained below, MBSC's claim fails on all fronts.

*First*, MBSC does not show a disparate impact. The root of this question is whether similarly situated individuals were treated differently. *Sylvia Dev. Corp.*, 48 F.3d at 825. Here, MBSC claims two types of disparate treatment: (1) the overlay bans conversions for "oceanfront property owners" within the overlay but not outside of it, and (2) the overlay allows buildings other than multi-family dwellings currently used as short term rentals to convert to long term rentals. Dkt. No. 1-1 at 16, ¶¶59–60. Yet MBSC fails to allege any facts showing these groups are similarly situated. *See Ani Creation*, 890 S.E.2d at 759 (holding that the boundaries of an overlay zone were rational and "[t]he disparate treatment of similarly situated businesses on either side of the [overlay zone's] boundary line is not a basis on which to find an equal protection violation."). For example, MBSC must not only show that oceanfront short term rentals in multi-family dwellings are similarly situated to non-oceanfront ones. It must also show that a single family home used as a short term rental is similarly situated to a 14-story former hotel with over 200 units like Sand Castle South. Yet MBSC never makes these showings. This is fatal to its claim.

*Second*, MBSC does not show any discriminatory intent based on these classifications. MBSC must allege facts showing "purposeful, invidious discrimination." *Sunrise Corp.*, 420 F.3d at 329. Put differently, the use of the alleged classification to discriminate must be "clear and intentional." *Sylvia Dev. Corp.*, 48 F.3d at 819 (quoting *Snowden*, 321 U.S. 8). The only allegation which, if liberally construed, could constitute an allegation of discriminatory intent is that the overlay "was adopted specifically to thwart MBSC's proposed conversion." Dkt. No. 1-1 at 16, ¶¶62. The only fact alleged to support this claim is that the moratorium was given first reading shortly after MBSC submitted its application. *Id.* A mere coincidence of timing for a temporary moratorium is legally insufficient to show discriminatory intent. This is particularly true when: (1) the moratorium and overlay zone runs the entire length of the City's oceanfront rather than just

MBSC's property; (2) MBSC does not allege it is the only property affected by the overlay; (3) the City had already rejected MBSC's business license application to operate long term rentals for unrelated reasons, and MBSC did not object to that finding, cure the defects, or ask for more time to comply; (4) the overlay was put in place only after a study showed the deleterious effects converting to long term rentals would have; (5) the Planning Commission found that the overlay is consistent with the City's comprehensive plan; and (6) the area historically had been used for short term accommodations. The complaint, and the documents referenced in and integral to it, therefore disprove any notion of discriminatory intent towards MBSC.

*And third*, MBSC also fails to allege any facts showing a lack of legitimate legislative purpose. "[W]hen social or economic legislation is involved, the states are permitted wide latitude in adopting classifications to further legitimate governmental purposes." *Sylvia Dev. Corp.*, 48 F.3d at 820. MBSC admits that City Council was presented with the Arnett Muldrow study which articulates potential losses to the city and the region resulting from the conversion of beachfront properties. Dkt. No. 1-1 at 7, ¶26; *see generally* Ex. B. The Planning Commission also found that the overlay is consistent with both the Land Use and Economic Development Elements of the City's comprehensive plan. Ex. C at 1. That comprehensive plan details how the benefits of overnight tourism extend to all citizens and facets of the City. *E.g.*, Ex. D at 23. All this led City Council to adopt the ordinance specifically "[t]o sustain the economic vitality of the Myrtle Beach oceanfront by preserving and enhancing tourist accommodations between Kings Highway and the Atlantic Ocean." Dkt. No. 1-1 at 7–8, ¶28. While the overlay is not purely driven by economics— it is driven by the desire to provide better services and quality of life—an economic motive is equally proper. *See City of New Orleans v. Dukes*, 427 U.S. 297, 303, (1976) (upholding a New Orleans city ordinance which was "solely an economic regulation aimed at enhancing the vital role

of the French Quarter's tourist-oriented charm in the economy" as a rational means to achieving that end). So from any perspective, the complaint and its associated documents contain more than ample support for the City's decision to implement the overlay.

MBSC therefore fails to state any element of an equal protection claim. The Court should dismiss the claim with prejudice.

## IV.     MBSC Fails to Show the City Took Its Property.

Both the U.S. and South Carolina Constitutions guarantee just compensation when private property is taken for public use. U.S. Const. amend V; S.C. Const. art. I, § 13(A). The analysis is the same under both provisions. *Byrd v. City of Hartsville*, 620 S.E.2d 76, 79 n.6 (S.C. 2005). Courts have acknowledged a *per se* taking where a use restriction denies the owner all economically beneficial use of the land. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 115 (1992). In most cases, however, the court is required to employ a "a flexible balancing test to determine whether compensation is required." *Blackburn v. Dare Cnty.*, 58 F.4th 807, 810 (4th Cir.) (cleaned up). Most regulatory takings are analyzed under the *Penn Central* factors to determine whether a taking has occurred when governmental regulation restricts less than all economically beneficial use of property: (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

But first, MBSC must show that it has a relevant property right. A permit or license which has not been issued is not a property right protected by the Takings Clause. *Sunrise Corp.*, 420 F.3d at 330; *Scott*, 716 F.2d at 1421 n.20. Because MBSC did not have a business license to operate

long term rentals, the overlay did not "take" anything from MBSC in the constitutional sense. Its claim therefore fails out of the gate.

Even assuming MBSC has a property right, its claim fails yet again because MBSC cannot show that any property was taken. To start, MBSC does not allege a substantial diminution in value under the first *Penn Central* prong. *See Blackburn*, 58 F.4th at 812 (analyzing part one of the test by "weigh[ing] the diminution in value that the ban caused to the property against the value of the [property] unburdened"). The complaint claims a 27.5% diminution in the property's value because of the overlay.[3] Dkt. No. 1-1 at 8, ¶30. Those losses do not constitute an economic impact great enough to become a taking. *See Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, 354 (4th Cir. 2021) (holding that the first factor weighs against plaintiffs when they alleged only a 40% diminution in value); *see also Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018) ("Even if we assume that [the plaintiff] has suffered an eighty-three percent diminution in the value of its property, that is not enough on its own to establish a taking."). On top of this, MBSC's 27.5% diminution in value is overstated, as it also fails to account for any potential mitigation of damages and any general increase in the property's current value as short term rentals. This places its realized diminution in value even further from the required threshold.

MBSC also fails the second prong of *Penn Central* because its claimed investment backed expectations were contingent on a speculative future use of the property. Dkt. No. 1-1 at 18, ¶71. Expectations formed on "speculative hopes—dependent on receiving a government service to which the plaintiff has no entitlement—are not the reasonable investment-backed expectations

---

[3] MBSC states the present market value of the property as long term rentals is $23,335,000, which MBSC alleges yields a loss of $6,435,000 based on MBSC's $16,900,000 purchase price. Dkt. No. 1-1 at 8, ¶30. This results in a claimed 27.5% diminution in property value. MBSC's total claimed damages of over $10 million includes other costs, fees, and interest beyond the change in property value.

relevant to the *Penn Central* analysis." *Quinn v. Bd. of Cnty. Commissioners for Queen Anne's Cnty.*, 862 F.3d 433, 442 (4th Cir. 2017). MBSC's only claim to an investment backed expectation is just that—speculative. And the complaint admits as much by stating there was "a reasonable investment-backed expectation, prior to acquiring the Properties, that it *would be* allowed to engage in long-term rentals." Dkt. No. 1-1 at 18, ¶74 (emphasis added). An "investment backed expectation" for a project contingent on a yet-approved future use, a use which was not even in compliance with applicable codes, is not a reasonable expectation.

Lastly, MBSC fails to plead any facts to show that the City's regulation is "illegitimate and fails to advance a lawful public purpose." Dkt. No. 1-1 at 19, ¶75. Trying to speak facts into existence, MBSC does not support this assertion, and for the ample reasons given above MBSC fails to challenge the "character" of the City's ordinance in any meaningful way as required to establish a regulatory taking. "To find a taking here would revolutionize zoning law and severely constrict local governments' ability to direct democratically the very nature and character of the community." *Quinn*, 862 F.3d at 443.

Because MBSC fails to demonstrate any element of the *Penn Central* test, it fails to plead any facts supporting a regulatory taking. The Court therefore should dismiss this claim too.

## V.     MBSC Fails To Allege A Violation Under 42 U.S.C. § 3604 and § 3617.

The Fair Housing Act makes it unlawful to discriminate on the basis for race, color, religion, sex, familial status, or national origin in connection with buying, selling, renting, or offering housing. 42 U.S.C. § 3604(a)–(b). MBSC alleges that the City violated these statutes because its "actions impose a disproportionate harm" on minority communities by making housing unavailable. Dkt. No. 1-1 at 20, ¶81. Claims brought under § 3604 are analyzed under a 3-step burden-shifting framework, where the plaintiff must first demonstrate a robust causal connection

between the defendant's actions and disparate impact on a protected class. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 91 F.4th 270, 276 (4th Cir. 2024) (cleaned up). If met, the burden then shifts to the defendant to state and explain the valid interest served by its policies. *Id.* If the defendant can show a valid policy interest, the burden shifts back to the plaintiff to show a less discriminatory alternative. *Id.* MBSC fails each of these steps.

First, MBSC has not alleged any facts showing a causal connection between the overlay and a disparate impact on minority communities. Merely stating there is a discriminatory effect is insufficient. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 543 (2015) ("A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact."); *see also* Dkt. No. 1-1 at 20, ¶81 (baldly alleging that the City's actions cause disparate harm). That ends the analysis. But even going further, the City's valid interests in the overlay zone provide another end to this inquiry. Without belaboring the City's interests explained repeatedly in this motion, the City's valid concerns relating to the public safety and general welfare of the City and its citizens easily clear this hurdle. *See Texas Dep't of Hous. & Cmty. Affs.*, 576 U.S. at 544 ("Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities."). And MBSC fails to allege any less discriminatory alternatives to achieving these ends. MBSC therefore has failed to allege a violation of § 3406.

MSBC also alleges the City violated 42 U.S.C. § 3617, which makes it is unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of . . . any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." Dkt. No. 1-1 at 21–22, ¶¶86–94. Because MBSC's claims under this section are predicated on disparate impact and

24

discriminatory intent, which are the root of its claims under § 3604(a) and § 3604(b), its failure to establish those claims for reasons above dooms this claim as well. *See id.* at 21–22, ¶¶88–93. Also, MBSC's predicate under § 3617 that its housing units "meet[] all zoning and land use requirements," Dkt. No. 1-1 at 22, ¶91, is false. As noted repeatedly in this motion, MBSC did *not* meet all applicable codes and, in fact, was legally prohibited from converting its units to long term rentals for that reason. *Id.* at 6, ¶16; Ex. F. MBSC cannot conjure a discrimination claim out of thin air because it does not like the result of its own actions.

This Court therefore should dismiss MBSC's meritless Fair Housing Act claims.

## CONCLUSION

Local governments are given wide latitude to enact zoning regulations. MBSC cannot frustrate that power by demanding to use its property in a manner which City Council found would be harmful to the interests of the City, its residents, and its visitors. And MBSC certainly cannot frustrate that power by asking for special permission to use its property in a way which it was barred from doing before the moratorium and overlay at issue, just so it can make more money. Yet that is all this lawsuit is about. This Court should dismiss MBSC's claims with prejudice and end this matter.

[Signature page follows]

Respectfully submitted,

**WILLOUGHBY HUMPHREY & D'ANTONI, P.A.**

/s/ *R. Walker Humphrey, II*
R. Walker Humphrey, II, Fed. Bar No. 12524
James T. Johnson, Fed. Bar No. 14418
133 River Landing Drive, Suite 200
Charleston, South Carolina 29492
Telephone Number: 843-619-4426
whumphrey@whdlawyers.com
jjohnson@whdlawyers.com

Mitchell Willoughby, Fed. Bar No. 4702
Hunter R. Pope, Fed. Bar No. 13778
Post Office Box 8416
Columbia, South Carolina 29202
Telephone Number: 803-252-3300
mwilloughby@whdlawyers.com
hpope@whdlawyers.com

*Attorneys for Defendant City of Myrtle Beach*

March 31, 2025
Charleston, South Carolina