IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| MBSC Property South, LLC, | ) | Case No.: 4:25-cv-1475-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| The City of Myrtle Beach, South | ) | **ORDER GRANTING IN PART AND** |
| Carolina, | ) | **DENYING IN PART DEFENDANT'S** |
| Defendant. | ) | **MOTION TO DISMISS** |
| | ) | |

This is a land use case. Defendant The City of Myrtle Beach, South Carolina ("City of Myrtle Beach" or "City"), moves to dismiss (DE 14) Plaintiff MBSC Property South, LLC's ("MBSC") Amended Complaint (DE 8). MBSC filed a response in opposition. (DE 17.) The City of Myrtle Beach thereafter filed a reply. (DE 20.)

For the reasons below, the Court grants in part and denies in part the City's Motion to Dismiss (DE 14).

## I.     BACKGROUND

### A.     Factual Background

The following facts are drawn from MBSC's Amended Complaint and its attached exhibits.[1] (DE 8.) For purposes of resolving the pending Rule 12(b)(6) motion, the Court accepts these allegations as true and views them in the light most favorable to MBSC.

---

[1]     On a Rule 12(b)(6) motion, a district court generally does not consider extrinsic evidence in assessing the sufficiency of a complaint. The Court may, however, consider documents attached to the complaint or to the motion to dismiss, provided those documents are integral to the complaint and their authenticity is not disputed. *See Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

This dispute arises from the City of Myrtle Beach's adoption of a temporary moratorium and subsequent Short-Term Rental Conversion ("STRC") Overlay Zone, which together restrict the conversion of certain oceanfront properties from short-term rentals to long-term residential uses. MBSC contends that these actions were aimed at preventing its planned conversion of the Sand Castle South property into long-term rentals and caused it substantial financial harm.

### 1. MBSC's Acquisition of Sand Castle South

In September 2022, MBSC purchased 165 condominium units in the Sand Castle South Horizontal Property Regime, out of 240 units, for approximately $16.9 million. (*Id.* at 3–4 ¶¶ 8–11.) MBSC planned to convert the property into long-term rental units, including affordable and workforce housing, in partnership with the Myrtle Beach Housing Authority. (*Id.* at 4 ¶¶ 11–13.) MBSC alleges its investment-backed expectations were based on MU-H zoning regulations, which permitted multifamily residential uses as of right, and on the City's 2024 Comprehensive Plan,[2] which encouraged affordable housing along South Ocean Boulevard. (*Id.* at 4–5 ¶¶ 13–15.)

---

[2]       Under the South Carolina Local Government Comprehensive Planning Enabling Act of 1994, a comprehensive plan is a legally required, long-range policy document adopted by local governments to guide growth, development, and preservation. *See* S.C. Code Ann. § 6-29-310 et seq. It must be based on research and public input and address nine core elements: population, economic development, natural resources, cultural resources, community facilities, housing, land use, transportation, and priority investment. The plan functions as the community's blueprint for future decision-making, balancing social, economic, and environmental interests, and must be reviewed at least every five years and fully updated at least every ten years to remain current and effective.

### 2. Engagement with the City Regarding Business Licensing

In early 2024, MBSC initiated the process of securing a business license to operate Sand Castle South as long-term rentals. (DE 8 at 5 ¶¶ 16–18.) City staff confirmed that long-term rentals were a permitted use and directed MBSC to undertake certain landscaping, buffering, and site improvements before the license could be issued. (*Id.* at 6–7 ¶¶ 21–25.) MBSC hired contractors, paid for improvements, and began the required work, including payments exceeding $38,000 to landscaping and fencing contractors. (*Id.* at 7–8 ¶ 27.)

On February 29, 2024, MBSC submitted a formal business license application for long-term rentals. (*Id.* at 8 ¶ 32.) On March 12, 2024, the City rejected the application, citing noncompliance with applicable codes despite prior collaboration with MBSC regarding compliance. (*Id.* at 8 ¶ 33.) MBSC submitted a second application in August 2024, but the City did not act on it. (*Id.* at 12 ¶ 52.)

### 3. Adoption of the Moratorium

On April 9 and May 14, 2024, the Myrtle Beach City Council adopted Ordinance 2024-27, which imposed a temporary moratorium on the conversion of multifamily short-term rental properties to long-term rentals within the area between Kings Highway and the Atlantic Ocean. (DE 8 at 10–11 ¶ 45.) Ordinance 2024-27 regulated:

> All activities by the City Planning & Zoning Department, Construction Services Department and Fire Department as well as all activities by, all City boards or commissions, in connection with property in close proximity to the beach converting units within multi-unit buildings from short term rental to long term rental are temporarily suspended and a temporary moratorium is established in order for the City, through its officials, staff, boards and/or committees, to have adequate time and

> opportunity to study and analyze the loss of short term rental inventory and the impacts and consequences resulting therefrom and to make recommendations to City Council concerning changes to the City's Zoning Code and other ordinances and regulations relating to zoning and land use planning.

(DE 8-12 at 5.) The moratorium ordinance defined "property in close proximity to the beach" as:

> property in zoning classifications that permit visitor accommodation, commonly known as short term rental, in an area spanning from the east or seaward side of Ocean Boulevard to Kings Highway, and from Grande Dunes Boulevard to the point where Ocean Boulevard and Kings Highway intersect near the south City limits.

(*Id.*) The City stated the moratorium was necessary to study the potential impacts of such conversions on tax revenues, employment, and public services. (DE 8 at 10–11 ¶¶ 47–49.)

During the moratorium, the City retained a consultant, Arnett Muldrow & Associates, whose report concluded that long-term rental conversions would reduce tax revenues, increase emergency response times, and negatively affect employment in the City. (*Id.* at 12 ¶¶ 53–54.)

**4. Enactment of the STRC Overlay**

On December 3 and 10, 2024, City Council adopted Ordinance 2024-69, establishing the STRC Overlay Zone. (*Id.* at 12–13 ¶ 55.) The overlay prohibits any building with more than two units, if ever used as a hotel or short-term rental, from being converted into long-term rentals within the designated area "for ninety (90) continuous days or more." (*Id.* at 12–13 ¶ 56; DE 81-5.) The stated purpose of the Overlay is "to sustain the economic vitality of the Myrtle Beach oceanfront by

4

preserving and enhancing tourist accommodations between Kings Highway and the Atlantic Ocean." (DE 8 at 12–13 ¶ 56.)

### 5. MBSC's Alleged Harm

MBSC contends that the moratorium and STRC Overlay were enacted in direct response to its plans to convert Sand Castle South to long-term rentals. (DE 8 at 10–12 ¶¶ 44, 48, 51–52.) MBSC alleges that these ordinances thwarted its investment-backed expectations, prevented the issuance of long-term rental business licenses, and caused significant financial harm. (*Id.* at 13–16 ¶¶ 65–70.)

Specifically, MBSC alleges that had the conversion proceeded, the property would have been valued between $26 million and $30 million based on projected rental income and capitalization rates. (*Id.* at 14 ¶ 68.) Instead, MBSC asserts that the City's actions deprived it of between $4 million and $8 million in anticipated profits. (*Id.* at 14 ¶ 69.) MBSC further alleges that its current basis in the property is approximately $22 million, comprised of $16.1 million in debt and $6 million in equity, and that foreclosure is a near certainty absent relief. (*Id.* at 15 ¶ 70.) MBSC claims it stands to lose approximately $7 million in cash equity in addition to ongoing interest, carrying costs, and attorney's fees. (*Id.* at 15–16 ¶ 72.)

Finally, MBSC asserts that the City's actions conflict with the 2024 Comprehensive Plan, unlawfully restrict affordable housing opportunities along the oceanfront, and have a discriminatory effect on protected classes under the Fair Housing Act. (*Id.* at 13–18 ¶¶ 57–72.)

**B.    Procedural Background**

MBSC commenced this action on February 5, 2025, by filing a complaint in the Horry County Court of Common Pleas, Case No. 2025-CP-26-00973. (DE 1-1.) The complaint alleged federal constitutional claims under 42 U.S.C. § 1983, claims under the Fair Housing Act, and a state-law claim for declaratory judgment. (*Id.*)

On March 10, 2025, the City removed the case to this Court pursuant to 28 U.S.C. §§ 1331 and 1441, asserting federal question jurisdiction, and invoking supplemental jurisdiction under 28 U.S.C. § 1367 for the state-law claims. (DE 1.)

On March 31, 2025, the City moved to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (DE 5.) On April 21, 2025, within twenty-one days of the City's motion, MBSC filed its Amended Complaint as a matter of course under Rule 15(a)(1)(B), which superseded the original complaint and mooted the pending motion to dismiss. (DE 8.)

The Amended Complaint is the operative pleading and asserts six causes of action:

1.   Declaratory Judgment under S.C. Code Ann. § 15-53-10, et seq. (2024), and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

2.   Federal and State Substantive Due Process Violations – 42 U.S.C. § 1983.

3.   Federal and State Equal Protection Violations – 42 U.S.C. § 1983.

4.   Federal and State Regulatory Taking.

5.   Violation of the Fair Housing Act of 1968, 42 U.S.C. § 3604.

6.   Violation of the Fair Housing Act of 1968, 42 U.S.C. § 3617.

(*Id.*) On May 27, 2025, the City moved to dismiss the Amended Complaint in its entirety under Rule 12(b)(6). (DE 14.) MBSC responded in Opposition on June 24, 2025. (DE 17.) The City replied on July 11, 2025. (DE 20.) The motion is now ripe for resolution.

## II.    LEGAL STANDARD

### Fed. R. Civ. P. 12(b)(6)

A motion to dismiss for failure to state a claim challenges the legal sufficiency of a complaint. *See Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir. 1993). To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). While a complaint "does not need [to allege] detailed factual allegations," pleadings that contain mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). In other words, "where the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Rule 8(a)(2), Fed. R. Civ. P.).

## III.  DISCUSSION

The City argues that municipal zoning ordinances are entitled to a strong presumption of validity and that local governments enjoy broad discretion in land-use regulation. (DE 14.) On that basis, the City maintains that MBSC's Amended Complaint—which asserts six causes of action—fails to state any plausible claim for relief because the allegations are conclusory, insufficient as a matter of law, or in some cases, abandoned. (DE 14; DE 20 at 2–3, 8–13.) The Court addresses each claim in turn, beginning with MBSC's request for declaratory judgment.

## A.   Declaratory Judgment Claim[3]

MBSC seeks a declaration that the City's STRC Overlay district violates the South Carolina Local Government Comprehensive Planning Enabling Act of 1994 ("Planning Act"), S.C. Code Ann. §§ 6-29-310 to -1640 (2024). Both the South Carolina Declaratory Judgment Act and the Federal Declaratory Judgment Act permit courts of record to declare rights where an actual controversy exists. S.C. Code Ann. § 15-53-20 (2024); 28 U.S.C. § 2201. A declaratory judgment action is justiciable where

---

[3]     The City argues that several claims in MBSC's Amended Complaint should be deemed abandoned because MBSC did not substantively address them in its response brief. (DE 20 at 2–3, 8–13); citing *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) ("A waiver is the intentional relinquishment or abandonment of a known right."). The Court declines to resolve the motion on that basis. Instead, consistent with Rule 12(b)(6), the Court addresses each claim in the Amended Complaint on the merits. Where Plaintiff's theories fail as a matter of law—such as spot zoning, unauthorized taxation, impairment of contract rights, and vested rights—they are dismissed with prejudice.

there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). To that end, MBSC seeks a declaration under the Planning Act and South Carolina land use common law, advancing six theories:

- The ordinance was enacted for an impermissible purpose— generating tax revenue—in violation of S.C. Code Ann. § 6-29-710 (2024).

- The ordinance conflicts with the Comprehensive Plan and violates the uniformity requirement of S.C. Code Ann. § 6-29-720(B) (2024).

- The ordinance fails to advance a legitimate "special public interest," as required for overlay zones under S.C. Code Ann. § 6-29-720(C)(5) (2024).

- The ordinance was adopted without compliance with the statutory notice and hearing requirements set forth in S.C. Code Ann. § 6-29-760(A) (2024).

- The ordinance is arbitrary and unreasonable, lacking a legitimate public welfare basis.

- The ordinance constitutes unlawful spot zoning, imposes an unauthorized tax, unlawfully restricts contractual rights, and violates vested rights.

(*See* DE 8 ¶ 75.)

## 1. Governing Law

### a. The Planning Act

The South Carolina General Assembly has adopted the Planning Act, which grants local governments the power to regulate land use. *See* S.C. Code Ann. §§ 6-29-310 to -1640 (2024).

The Planning Act requires zoning ordinances to be for the "general purposes of guiding development in accordance with existing and future needs and promoting the public health, safety, morals, convenience, order, appearance, prosperity, and general welfare." S.C. Code Ann. § 6-29-710(A) (2024). To that end, the Planning Act allows

a governing body to regulate "the use of buildings, structures, and land; [and] the size, location, height, bulk, orientation, number of stories, erection, construction, reconstruction, alteration, demolition, or removal in whole or in part of buildings and other structures." S.C. Code Ann. § 6-29-720(A) (2024). It also provides that zoning regulations must be adopted "in accordance with the comprehensive plan" and may be enacted for a variety of public purposes, including guiding development in accordance with present and future needs; promoting public health, safety, morals, convenience, prosperity, and general welfare; lessening congestion in the streets; securing safety from fire, flood, and other dangers; providing adequate light and air; preventing overcrowding of land and undue concentration of population; and facilitating the creation of a convenient, attractive, and harmonious community. *Id.* § 6-29-720(A)(1)–(7). In addition, the statute contains a broad catchall permitting zoning "[t]o further the public welfare in any other regard specified by a local governing body." § 6-29-710(A)(8).

To implement these purposes, the Planning Act authorizes the use of various zoning techniques, including "overlay zones"—zones that "impose a set of requirements or relax a set of requirements imposed by the underlying zoning district when there is a special public interest in a particular geographic area that does not coincide with the underlying zone boundaries." § 6-29-720(C)(5).

### b. Spot Zoning

The governing law in South Carolina recognizes two forms of spot zoning: traditional spot zoning, which arises when a small parcel is singled out for a use classification inconsistent with surrounding property to the benefit of its owner and detriment of others, and reverse spot zoning, which occurs when a parcel is subjected to more restrictive zoning than its adjoining neighbors, often resulting in a zoning "island." *Ani Creation, Inc. v. City of Myrtle Beach Bd. of Zoning Appeals*, 440 S.C. 266, 281–83, 890 S.E.2d 748, 756–57 (2023), *cert. denied* sub nom. *Ani Creation, Inc. v. Myrtle Beach*, 144 S. Ct. 556, 217 L. Ed. 2d 296 (2024). Spot zoning is not inherently unlawful; it is invalid when it contradicts the municipality's comprehensive zoning plan or serves only private gain rather than the public welfare. *Talbot v. Myrtle Beach Bd. of Adjustment*, 222 S.C. 165, 175, 72 S.E.2d 66, 71 (1952). Courts reviewing such claims focus on whether the zoning adheres to the comprehensive plan and promotes the general welfare, while intervening only to correct clear injustices. *Knowles v. City of Aiken*, 305 S.C. 219, 223, 407 S.E.2d 639, 642 (1991).

### c. Vested Rights

In South Carolina, a landowner may acquire a vested right to continue a lawful use of property that predates the enactment of a zoning ordinance prohibiting such use, unless continuation of the use would be detrimental to public health, safety, or welfare. *See James v. City of Greenville*, 227 S.C. 565, 584, 88 S.E.2d 661, 671 (1955) (Legge, J., concurring). The vested rights doctrine rests on constitutional principles preventing retroactive application of zoning ordinances and extends to circumstances where, relying on a validly issued permit, the landowner has in good faith made

substantial expenditures, obligations, or changes in position. *See Friarsgate, Inc. v. Town of Irmo*, 290 S.C. 266, 269–70, 349 S.E.2d 891, 893–94 (Ct. App. 1986) (citing *City Ice Delivery Co. v. Zoning Bd. of Adjustment*, 262 S.C. 161, 203 S.E.2d 381 (1974)). And vested rights are entitled to protection not only when acquired after the issuance of a permit, but also when acquired upon the filing of a proper application under the zoning ordinance then in effect, so long as the landowner has relied in good faith on the right to use the property as permitted at the time of the application. *See Pure Oil Div. v. City of Columbia*, 254 S.C. 28, 34, 173 S.E.2d 140, 143 (1970). Still, a contemplated or intended use not actually in existence at the time the ordinance becomes effective does not qualify as a protected nonconforming use.

### 2. Declaratory Judgment Theories

The City contends dismissal is warranted on MBSC's declaratory judgment claims because zoning ordinances are entitled to a "strong presumption" of validity. *See Rush v. City of Greenville*, 143 S.E.2d 527, 531 (S.C. 1965). According to the City, MBSC's allegations—even if accepted as true—fail to plausibly allege any constitutional, statutory, or common-law violation. (DE 14 at 7–9; DE 20 at 2–3.) MBSC has attached several exhibits to its Amended Complaint. "[I]n the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails." *Wells v. Fuentes*, 126 F.4th 882, 893 n.10 (4th Cir. 2025) (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)). Against this backdrop, the Court addresses each of MBSC's theories in turn.

### a.     Alleged Violation of S.C. Code Ann. § 6-29-710 (2024)

MBSC alleges that the STRC Overlay's "true purpose" is to generate tax revenue, which it contends is not a permissible zoning objective under § 6-29-710. (DE 8 ¶ 75(a)(i); DE 17 at 11–12.) According to the Amended Complaint, the purpose of the STRC Overlay is to "sustain the economic vitality of the Myrtle Beach oceanfront by preserving and enhancing tourist accommodations between Kings Highway and the Atlantic Ocean." (DE 8 ¶ 75(a)(i).)

The City responds that MBSC mischaracterizes the ordinance's stated purpose, which it frames not as mere revenue generation but as sustaining Myrtle Beach's economic vitality through preservation of tourist accommodations. (DE 14 at 9–11 (citing DE 8-14 at 6–9; DE 8-16 at 23).) The City further argues that fiscal considerations fall within legitimate zoning purposes, noting that § 6-29-710(A)(8) permits zoning "[t]o further the public welfare in any other regard specified by a local governing body." (DE 14 at 10–11.)

At this stage, however, the Court's task is limited to assessing the sufficiency of the pleadings. It may not resolve disputes over the ordinance's actual purpose. *See King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016). Accepting MBSC's allegations as true, the claim that the Overlay was enacted for an impermissible fiscal purpose plausibly states a violation of § 6-29-710. Whether MBSC can ultimately overcome the strong presumption of validity afforded to zoning ordinances will depend on a substantial evidentiary showing at later stages. Accepting MBSC's allegations as true, the complaint states a plausible claim under S.C. Code Ann. § 6-29-710 (2024), and dismissal is unwarranted.

13

### b. Alleged Violation of S.C. Code Ann. § 6-29-720(B) (Comprehensive Plan and Uniformity)

MBSC asserts that the Overlay conflicts with the City's Comprehensive Plan, which encourages affordable and workforce housing along the oceanfront through Housing Choice Voucher programs. (DE 8 ¶ 62; DE 17 at 12–13.) MBSC also contends that the Overlay irrationally distinguishes between short-term rentals and long-term rentals in violation of S.C. Ann. § 6-29-720(B) (2024). (DE 8 ¶ 75(a)(iii).)

The City responds that the Overlay is consistent with at least some elements of the Comprehensive Plan and that such determinations are sustained if "fairly debatable." (DE 14 at 11–14, citing *Rushing v. City of Greenville*, 217 S.E.2d 797, 799 (S.C. 1975).) The City also maintains that the ordinance satisfies the uniformity requirement because it applies equally to all multifamily dwellings engaged in short-term rental use. (*Id.*)

At this stage, the Court concludes that MBSC's allegations of inconsistency with the Housing Element of the Comprehensive Plan are sufficient to state a plausible claim. Whether the City's action was "fairly debatable" cannot be resolved on a Rule 12(b)(6) motion. *See Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) ("[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." (internal quotation marks omitted)).

By contrast, MBSC's uniformity claim is more tenuous. The ordinance applies uniformly within the Overlay, yet the statute requires uniformity within "each class or kind of use." *S.C. Code Ann.* § 6-29-720(B) (2024). MBSC's allegation that the City

14

irrationally distinguished between short-term and long-term residential rentals is minimally sufficient, but only just so, to survive dismissal. And so, accepting MBSC's allegations as true, the complaint states a plausible claim under S.C. Code Ann. § 6-29-720(B) (2024), and dismissal is unwarranted.

### c.     Alleged Violation of S.C. Code Ann. § 6-29-720(C)(5)

Section 6-29-720(C)(5) authorizes municipalities to create "overlay zones," defined as zones that "impose a set of requirements or relax a set of requirements imposed by the underlying zoning district when there is a special public interest in a particular geographic area that does not coincide with the underlying zone boundaries." S.C. Code Ann. § 6-29-720(C)(5) (2024). MBSC alleges that the STRC Overlay fails to satisfy this statutory requirement because it does not advance any legitimate "special public interest." Instead, MBSC contends that the Overlay was adopted to protect municipal revenues by restricting long-term rentals. (DE 8 ¶ 75(a)(iv); DE 17 at 14.)

The City counters that the Overlay is justified by the unique characteristics of Myrtle Beach's oceanfront, which implicate tourism, safety, and community welfare. (DE 14 at 15.) In the City's view, these considerations are quintessential examples of "special public interests" recognized by the Planning Act.

At this stage, however, the Court must accept MBSC's allegations as true. Whether the Overlay serves a bona fide "special public interest" or instead reflects a pretext for fiscal motives presents a factual dispute not suitable for resolution on a Rule 12(b)(6) motion. *See King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

Accordingly, MBSC has plausibly alleged a violation of *S.C. Code Ann.* § 6-29-720(C)(5) (2024), and dismissal is unwarranted.

### d.     Alleged Violation of S.C. Code Ann. § 6-29-760(A) (Notice and Hearing)

Section 6-29-760(A) of the Planning Act provides that "[b]efore enacting or amending any zoning regulations or maps, the governing authority or the planning commission, if authorized by the governing authority, shall hold a public hearing on it, which must be advertised and conducted according to lawfully prescribed procedures." S.C. Code Ann. § 6-29-760(A) (2024). At a minimum, the statute requires fifteen days' published notice in a newspaper of general circulation, and in cases involving rezoning, conspicuous notice posted on or adjacent to the property affected. *Id*.

MBSC alleges that the City failed to comply with these requirements when adopting both the moratorium and the STRC Overlay. (DE 8 ¶ 75(a)(v); DE 17 at 14–15.) According to MBSC, no timely published notice was provided, and the required postings were not made on or near the affected properties.

The City responds that § 6-29-760(A) does not apply to the moratorium because it was not a "construction permit" proceeding, and does not apply to the STRC Overlay because the ordinance did not constitute a rezoning. (DE 14 at 16.) In the City's view, the procedures it followed were legally sufficient.

At this stage, however, the Court cannot determine as a matter of law whether the adoption of the STRC Overlay constituted a "zoning map amendment" subject to § 6-29-760(A), nor can it resolve factual disputes over whether adequate notice was

provided. Accepting MBSC's allegations as true, the complaint states a plausible claim under S.C. Code Ann. § 6-29-760(A) (2024), and dismissal is unwarranted.

### e.    Arbitrary and Unreasonable Action

MBSC alleges that the STRC Overlay is arbitrary and unreasonable. (DE 8 ¶ 75(b).) In particular, MBSC contends that the ordinance lacks any legitimate basis in public welfare and was instead enacted for fiscal purposes. The City responds that MBSC's own allegations identify multiple rational bases for the ordinance, including tourism-related interests, economic vitality, and community welfare. (DE 14 at 17.)

Although MBSC's allegations are limited, this claim substantially overlaps with its statutory challenges under S.C. Code Ann. §§ 6-29-710 and 6-29-720 (2024). If, as MBSC asserts, the Overlay was enacted solely to preserve tax revenues rather than to advance permissible zoning purposes, the ordinance could ultimately be deemed arbitrary and unreasonable. At this stage, however, the Court must accept MBSC's allegations as true. Accordingly, MBSC has plausibly alleged that the STRC Overlay is arbitrary and unreasonable, and dismissal is unwarranted.

### f.    Spot Zoning, Unauthorized Tax, Right to Contract, and Vested Rights

Lastly, MBSC seeks a declaratory judgment that the STRC Overlay constitutes unlawful spot zoning, imposes an unauthorized tax, unlawfully restricts contractual rights, and violates vested rights. The Court addresses each in turn.

### i. Spot Zoning

South Carolina recognizes two forms of spot zoning: traditional spot zoning, where a small parcel is singled out for classification inconsistent with surrounding properties to the benefit of its owner and the detriment of others; and reverse spot zoning, where a parcel is subjected to more restrictive regulations than surrounding properties, creating a zoning "island." *Ani Creation,* 440 S.C. at 281–83, 890 S.E.2d at 756–57 (defining both traditional and reverse spot zoning). Such zoning is invalid when inconsistent with a municipality's comprehensive plan or when it serves only private gain. *See Talbot,* 222 S.C. at 175, 72 S.E.2d at 71.

MBSC alleges the STRC Overlay constitutes unlawful spot zoning. (DE 8 ¶ 75(a)(vii).) But the ordinance, by its own terms, applies broadly to all properties "between Kings Highway and the Atlantic Ocean," within the municipal limits. (*Id.* ¶ 56; DE 8-15.) Exhibits attached to MBSC's Amended Complaint confirm the Overlay encompasses a large district of oceanfront property, not a single parcel or isolated tract. "[I]n the event of a conflict between the bare allegations in the complaint and any exhibit attached, the exhibit prevails." *Wells*, 126 F.4th at 893 n.10.

Because the Overlay applies across a substantial district with multiple owners and uses, it does not single out an individual tract for preferential or adverse treatment. MBSC has alleged no facts suggesting that the ordinance created a zoning "island" or that it was enacted for private gain. To the contrary, the scope of the Overlay places it well outside the traditional or reverse spot zoning categories recognized by South Carolina law.

Accordingly, MBSC fails to state a plausible claim that the STRC Overlay constitutes unlawful spot zoning.

### ii. Unauthorized Tax

MBSC seeks a declaration that the STRC Overlay is invalid because "its stated purpose is to preserve and enhance the City's existing tourism-based tax revenue streams, which . . . municipalities lack absent specific statutory authorization." (DE 8 at 18–19). In support, MBSC cites S.C. Code § 6-1-310 (2024) and *Burns v. Greenville Cnty. Council*, 433 S.C. 583, 861 S.E.2d 31 (2021). South Carolina law provides that "[a] local governing body may not impose a tax unless specifically authorized by the General Assembly." S.C. Code Ann. § 6-1-310.

Zoning ordinances, however, regulate land use and development; they do not, in themselves, levy or impose a tax absent the creation of revenue-raising fees or assessments. MBSC alleges that the STRC Overlay was "motivated by the desire to raise local tax revenue" (DE 8 at 19), but the text of the Overlay ordinance contains no provision imposing a fee, tax, or charge of any kind. *See Wells v. Fuentes*, 126 F.4th at 896 ("if a plaintiff bases his complaint on [an exhibit that] blatantly contradicts [his] allegations, then [the court] will dismiss those allegations as implausible") (citation and internal quotation marks omitted)).

The STRC Overlay regulates permissible uses of property within the designated district; it does not impose a tax. That the City may have considered fiscal consequences in adopting the ordinance does not transform a zoning regulation into

an impermissible tax. Accordingly, MBSC's "unauthorized tax" claim fails as a matter of law.

### iii. Contract Rights

MBSC also seeks a declaration that the STRC Overlay is invalid because it "purports to regulate MBSC's right to contract with tenants for occupancies longer than ninety (90) days – not the use of the Properties." (DE 8 ¶ 75(a)(vii).) According to MBSC, the ordinance unlawfully intrudes on its ability to enter into lease agreements with prospective tenants.

This claim is not viable. As a threshold matter, South Carolina law governs MBSC's state-law declaratory judgment claim. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Rush v. City of Greenville*, 246 S.C. 268, 143 S.E.2d 527, 531 (1965). MBSC's reliance on North Carolina decisions such as *City of Wilmington v. Hill*, 189 N.C. App. 173, 657 S.E.2d 670 (2008), and *Graham Court Assocs. v. Town of Chapel Hill*, 53 N.C. App. 543, 281 S.E.2d 418 (1981), is misplaced. Those cases apply North Carolina law, are not binding on this Court, and in any event, addressed ordinances regulating *ownership status* (such as an owner-occupancy requirement). By contrast, the STRC Overlay regulates the permissible *use* of property — namely, whether multi-unit buildings previously used for transient lodging may be converted to long-term rental housing within the overlay district. That distinction is critical.

Under South Carolina law, municipalities are expressly empowered to regulate "the use of buildings, structures, and land" for the general welfare. S.C. Code Ann. § 6-29-720(A). The law presumes zoning ordinances valid so long as their relationship

20

to public welfare is at least "fairly debatable." *Knowles v. City of Aiken*, 305 S.C. 219, 223, 407 S.E.2d 639, 642 (1991). Nothing in South Carolina jurisprudence recognizes a freestanding "contract rights" limitation on the zoning power. Instead, the relevant protections are (1) vested rights, which attach when a landowner has lawfully established a use or substantially relied on a validly issued permit, and (2) constitutional safeguards against retroactive impairment of existing contracts. *See Pure Oil Div. v. City of Columbia*, 254 S.C. 28, 34, 173 S.E.2d 140, 143 (1970); *Friarsgate, Inc. v. Town of Irmo*, 290 S.C. 266, 269–70, 349 S.E.2d 891, 893–94 (Ct. App. 1986).

MBSC has not plausibly alleged either circumstance. It does not allege that it had enforceable long-term lease contracts in place at the time the Overlay was enacted. Nor does it allege reliance on a validly issued permit authorizing long-term rental use prior to adoption of the ordinance. At most, MBSC alleges that it intended to contract with tenants in the future and that the Overlay makes such contracting economically unfeasible. But prospective business opportunities, however concrete in the marketplace, do not create vested rights or a constitutionally protected contract interest under South Carolina law.

Accordingly, MBSC's "contract rights" theory rests on non-binding North Carolina authority, misapprehends the nature of the STRC Overlay as a land-use regulation, and fails to state a claim under South Carolina law. The claim is dismissed as a matter of law.

### iv. Vested Rights

MBSC also contends that the STRC Overlay unlawfully infringes vested rights because it applied for a business license to operate Sand Castle South as long-term rentals and undertook expenditures in reliance on the City's prior assurances. (DE 8 ¶¶ 27, 32–33, 52, 75(a)(viii).)

South Carolina law recognizes vested rights in two limited circumstances: (1) where a lawful nonconforming use existed prior to adoption of a zoning restriction, or (2) where a landowner, in reliance on a validly issued permit, made substantial expenditures or incurred significant obligations. *See Friarsgate, Inc. v. Town of Irmo*, 290 S.C. 266, 269–70, 349 S.E.2d 891, 893–94 (Ct. App. 1986); *Pure Oil Div. v. City of Columbia*, 254 S.C. 28, 34, 173 S.E.2d 140, 143 (1970). Both circumstances require either an actual existing use or reliance on a valid permit. Mere expectations or intentions regarding a contemplated use are insufficient.

The Fourth Circuit recently reaffirmed these principles in *Brady v. City of Myrtle Beach*, 137 F.4th 233 (4th Cir. 2025). There, bar owners argued that the City's actions unlawfully interfered with their business licenses. The court rejected the claim, holding that "under South Carolina law, an interest that depends totally upon regulatory licensing is not a property interest." *Id.* at 239 (citing *Mibbs, Inc. v. S.C. Dep't of Revenue*, 337 S.C. 601, 524 S.E.2d 626, 628 (1999)). The Fourth Circuit emphasized that business licenses are regulatory privileges, not vested property rights and, therefore, do not provide a foundation for takings or due process claims.

That reasoning applies with full force here. MBSC never obtained a valid long-term rental business license. Its February 2024 application was denied, and its

August 2024 application was never approved. Because no license was ever issued, MBSC could not have acquired vested rights by relying on it. Expenditures made in anticipation of approval—such as landscaping and fencing improvements—were undertaken at MBSC's own risk and do not transform a denied application into a vested right. *See Brady*, 137 F.4th at 239; *Friarsgate*, 290 S.C. at 269–70.

Moreover, MBSC does not allege that a lawful nonconforming use existed prior to the STRC Overlay. At all relevant times, the property was used for short-term rentals, not long-term residential occupancy. Absent either an existing nonconforming use or reliance on a validly issued permit, no vested right exists under South Carolina law. Accordingly, MBSC's vested rights theory fails as a matter of law.

For these reasons, MBSC's claims premised on spot zoning, unauthorized taxation, unlawful restriction of contract rights, and vested rights are dismissed.

**B.     Federal and State Substantive Due Process Violations – 42 U.S.C. § 1983.**

MBSC asserts a violation of its substantive due process rights under the Fourteenth Amendment.[4] The Due Process Clause provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In the land-use context, substantive due process "bars certain arbitrary government actions 'regardless of the fairness of the procedures used to implement them.'" *Daniels v. Williams*, 474 U.S. 327, 337 (1986) (Stevens, J., concurring). Government action must not be "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926). To state a claim, a plaintiff must allege: (1) a property or property interest; (2) deprivation of that property or interest; and (3) governmental action so far beyond legitimate bounds that no process could cure the deficiency. *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 440 (4th Cir. 2002) (articulating elements of substantive due process claim in land-use context).

MBSC alleges ownership of 165 condominium units at Sand Castle South, acquired with the intent to convert them into long-term rentals, including affordable housing. MBSC contends that this use was permitted by right under MU-H zoning

---

[4]     MBSC asserts its due process and equal protection claims under both the United States and South Carolina Constitutions. *See* U.S. Const. amend. XIV, § 1; S.C. Const. art. I, § 3. Because South Carolina courts interpret the state constitutional guarantees of due process and equal protection as coextensive with their federal counterparts, the Court analyzes the federal and state claims together. *See Denene, Inc. v. City of Charleston*, 352 S.C. 208, 212, 574 S.E.2d 196, 198 (2002).

and expressly encouraged by the City's 2024 Comprehensive Plan. (DE 8 at 3–5 ¶¶ 10–15.) At this stage, these allegations suffice to plead a protected property interest.[5]

MBSC further alleges deprivation of that interest through the City's adoption of a moratorium and the STRC Overlay, which barred conversion of its property to long-term rentals, as well as through the City's rejection of its license application despite ongoing compliance efforts. (*Id.* at 8 ¶¶ 32–33; *id.* at 12–13 ¶ 56.) Accepting these allegations as true, MBSC has adequately alleged a deprivation.

The remaining question is whether the City's conduct was arbitrary. MBSC claims that the Overlay was enacted for the impermissible purpose of maximizing tourism tax revenue rather than promoting public health, safety, or welfare, and that it contradicted the City's own Comprehensive Plan. (*Id.* at 2 ¶ 2; *id.* at 10–11 ¶ 49; *id.* at 13–14 ¶¶ 61–64.) The City counters that the Overlay was supported by studies and Planning Commission findings indicating that preserving short-term rentals promoted economic vitality, emergency services, and employment. (DE 14 at 2–4; DE 20 at 2–3.) Whether the ordinance was "fairly debatable" or an arbitrary fiscal measure presents a factual dispute not suitable for resolution on a Rule 12(b)(6) motion.

---

[5]     To avoid confusion, the Court clarifies that MBSC's constitutional claims do not rest on its business license applications. Under South Carolina law, a regulatory license does not create a vested property interest. *See Brady v. City of Myrtle Beach*, 137 F.4th 233, 239 (4th Cir. 2025); *Long v. Jordan*, 2024 WL 4117226, at *4–5 (D.S.C. Sept. 9, 2024) (holding that the existence of a lawfully issued business license does not itself create a vested property right for purposes of takings analysis). MBSC's asserted property interest instead derives from its ownership of the Sand Castle South condominium units and from the zoning classification in effect at the time of purchase, which allegedly permitted long-term residential rentals. The Court's analysis, therefore, proceeds from MBSC's ownership and zoning-use expectations, not from any claimed entitlement to a license.

Accordingly, MBSC has plausibly alleged a substantive due process violation, and the City's motion to dismiss this claim is denied.

## C.     Federal and State Equal Protection Violations – 42 U.S.C. § 1983.

MBSC further claims that the STRC Overlay violates the Equal Protection Clause, which provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This provision requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To state a claim, a plaintiff must allege (1) differential treatment of similarly situated parties, and (2) intentional or purposeful discrimination. *See Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 819 (4th Cir. 1995). If those elements are established, the Court must then determine whether the disparity can be justified under the applicable level of scrutiny. *Id.*

MBSC alleges that the Overlay prohibits hotel-to-long-term rental conversions while permitting other multifamily residential uses within the same MU-H zoning district. (DE 8 at 5 ¶ 15; *id.* at 12–13 ¶ 56.) MBSC further asserts that the Overlay was adopted in direct response to its proposed conversion, thereby intentionally singling out its property. (*Id.* at 11 ¶ 48.) Accepting these allegations as true, MBSC has plausibly alleged both differential treatment and intentional targeting.

Because MBSC is not a member of a suspect class and no fundamental right is implicated, rational basis review applies. *See Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012). Under this standard, a classification will be upheld if reasonably related to a legitimate governmental interest. *City of Cleburne*, 473 U.S. at 440.

26

The City contends that the Overlay advances legitimate interests, including preserving the tourism economy, protecting jobs, and ensuring adequate public services. (DE 14 at 2–4; DE 20 at 2–3.) MBSC, however, alleges that the ordinance was enacted for the impermissible purpose of maximizing tax revenues and that it directly contradicts the City's Comprehensive Plan. (DE 8 at 13–14 ¶¶ 61–64; DE 17 at 2–3.) These competing assertions present factual disputes not suitable for resolution on a motion to dismiss.

Accordingly, MBSC has plausibly alleged an equal protection violation, and the City's motion to dismiss this claim is denied.

## D.    Federal and State Regulatory Taking.

MBSC also asserts a claim under the Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, which provides that "private property" shall not "be taken for public use, without just compensation."[6] U.S. Const. amend. V, cl. 4. A taking may occur through physical appropriation or regulation that goes "too far" in restricting property rights. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–16 (1992) (recognizing categorical takings when regulation denies all economically beneficial use of land); *Md. Shall Issue v. Hogan*, 963 F.3d 356, 364 (4th Cir. 2020) (distinguishing physical and regulatory takings). Alleged regulatory takings are evaluated under the three *Penn Central* factors: (1)

---

[6]    MBSC also brings a parallel takings claim under the South Carolina Constitution, which provides that "[p]rivate property shall not be taken for private use without the consent of the owner, nor for public use without just compensation." S.C. Const. art. I, § 13. South Carolina courts interpret this provision as coextensive with the federal Takings Clause, and the Court, therefore, analyzes the federal and state claims together. *See Byrd v. City of Hartsville*, 365 S.C. 650, 656, 620 S.E.2d 76, 79 (2005).

the economic impact of the regulation, (2) the extent of interference with distinct investment-backed expectations, and (3) the character of the governmental action. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).

First, MBSC alleges the Overlay destroyed the economic foundation of its $16.9 million acquisition, eliminating projected profits of $4–8 million and placing the property at risk of foreclosure and loss of $7 million in equity. (*See supra* n.5; DE 8 at 14–16 ¶¶ 65–70.) These allegations plausibly state a severe economic impact.

Second, MBSC alleges that its investment-backed expectations rested on MU-H zoning, which permitted multifamily residential use by right, and on the City's 2024 Comprehensive Plan, which promoted affordable housing along the oceanfront. (DE 8 at 4–5 ¶¶ 13–15; *id*. at 13–14 ¶¶ 61–64.) MBSC further alleges reliance on City staff assurances and expenditures on site improvements in anticipation of a license. (*Id*. at 6–8 ¶¶ 21–27, 32.) At this stage, those allegations plausibly demonstrate distinct expectations.

Third, with respect to the character of the government action, MBSC alleges that the Overlay was motivated by fiscal concerns—preserving tourism revenue— rather than traditional health, safety, or welfare objectives, and that it was adopted in contradiction of the Comprehensive Plan. (DE 8 at 10–11 ¶¶ 47–49; *id*. at 12–13 ¶¶ 55–57.) The City disputes this characterization, citing studies linking conversions to adverse effects on emergency response, employment, and economic vitality. (DE 14 at 2–4.) Resolution of these competing factual claims is premature at the Rule 12(b)(6) stage.

Taken together, MBSC has plausibly alleged a regulatory taking under *Penn Central*. Accordingly, the City's motion to dismiss this claim is denied.

## E. Violations of the Fair Housing Act of 1968, 42 U.S.C. § 3604 and § 3617.

MBSC also brings claims under the Fair Housing Act ("FHA"), enacted as part of the Civil Rights Act of 1968 "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The FHA makes it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." *Id.* § 3604(a). It further prohibits interference with the exercise of rights protected by § 3604. *Id.* § 3617. The Supreme Court has confirmed that the FHA applies to municipal zoning and land-use decisions. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539–40 (2015); *Town of Huntington v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15, 18 (1988) (per curiam). Both intentional discrimination ("disparate treatment") and facially neutral policies with discriminatory effects ("disparate impact") are cognizable under the Act. *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018).

### 1. Disparate Treatment

To state a disparate treatment claim, a plaintiff must plausibly allege that the government acted with discriminatory intent. *Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 348 F. Supp. 2d 398, 417 (D. Md. 2005). Such intent may be established through circumstantial evidence. *Cf. Palmer v. Fannie Mae*, 755 F. App'x 43, 45 (2d Cir. 2018) (summary order).

MBSC alleges that the City adopted the STRC Overlay in response to its plan to convert Sand Castle South into long-term rentals for affordable and workforce housing, including in partnership with the Myrtle Beach Housing Authority through Project-Based Vouchers. (DE 8 at 4–5 ¶¶ 11–15; *id.* at 10 ¶ 41; *id.* at 13–14 ¶¶ 61–64.) MBSC further alleges that the Overlay eliminated a source of housing disproportionately serving minorities and lower-income residents and that the City has a history of resisting affordable housing initiatives along the oceanfront. (*Id.* at 11 ¶ 43; DE 17 at 23–25.) While MBSC does not identify overtly discriminatory statements, its allegations of targeted interference with voucher-supported housing are sufficient, at the pleading stage, to plausibly allege intentional discrimination.

### 2. Disparate Impact

Disparate impact claims are evaluated under the three-step, burden-shifting framework outlined in *Inclusive Communities*, 576 U.S. at 542. *See also Reyes*, 903 F.3d at 424. First, a plaintiff must allege a robust causal link between the challenged policy and the alleged disparate impact on a protected class. MBSC asserts that by prohibiting hotel-to-long-term rental conversions, the City effectively eliminated affordable housing opportunities that would have disproportionately benefited minority residents who rely on vouchers and other housing assistance. (DE 8 at 2 ¶ 2; *id.* at 13–14 ¶¶ 61–64; DE 17 at 23–25.) These allegations suffice at the pleading stage to establish the required causal connection.

Second, the City may articulate a valid governmental interest. The City argues that the Overlay was enacted to protect Myrtle Beach's tourism economy, preserve

employment, and ensure adequate emergency services. (DE 14 at 2–4; DE 20 at 2–3.) Such interests, if proven, are legitimate.

Third, the burden shifts back to the plaintiff to show that the City's interests could be served by less discriminatory alternatives. MBSC points to the City's 2024 Comprehensive Plan, which specifically identified the affected area for affordable housing initiatives through voucher programs as evidence that the City could have pursued its economic objectives without eliminating long-term rental conversions. (DE 8 at 13–14 ¶¶ 61–64; DE 17 at 26–27.) These allegations plausibly identify less discriminatory measures sufficient to survive a motion to dismiss.

In sum, MBSC has plausibly alleged both intentional discrimination and disparate impact under the FHA. While the City may ultimately demonstrate that the Overlay serves legitimate governmental interests and that no less discriminatory alternatives exist, those determinations are fact-intensive and inappropriate for resolution under Rule 12(b)(6). Accordingly, the City's motion to dismiss MBSC's Fair Housing Act claims is denied.[7]

## IV.     CONCLUSION

For the reasons above, the Court concludes as follows:

1.  MBSC's declaratory judgment claims under the South Carolina Planning Act survive in part. MBSC has plausibly alleged violations of *S.C. Code Ann.* §§ 6-29-710, 6-29-720(B), 6-29-720(C)(5), and 6-29-760(A) (2024), as well as a claim that the STRC Overlay is arbitrary and unreasonable. However, MBSC's theories, premised on unlawful spot zoning, unauthorized taxation,

---

[7]     The Court notes that MBSC's FHA claims are analytically distinct from its equal protection claim. Whereas the Equal Protection Clause requires proof of intentional discrimination, the FHA recognizes both disparate treatment and disparate impact theories. *See Reyes*, 903 F.3d at 424. Accordingly, the FHA claims are not duplicative and may proceed in parallel.

impairment of contract rights, and vested rights, fail as a matter of law and are dismissed.

2. MBSC has plausibly alleged violations of the substantive due process, equal protection, and takings guarantees under the United States and South Carolina Constitutions. The City's motion to dismiss those constitutional claims is, therefore, denied.

3. MBSC has also plausibly alleged both disparate treatment and disparate impact under the Fair Housing Act, 42 U.S.C. §§ 3604, 3617. The City's motion to dismiss those claims is denied.

Accordingly, the City's Motion to Dismiss (DE 14) is **granted in part and denied in part**. MBSC's claims for spot zoning, unauthorized taxation, unlawful restriction of contract rights, and vested rights are dismissed **with prejudice**. All other claims may proceed.

 **IT IS SO ORDERED.**

       Joseph Dawson, III
       United States District Judge

Florence, South Carolina
August 28, 2025